## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **DONALD "CHIP" CASSIDY, On Behalf** ) | **CASE NO. 1:05 CV 2223** |
| **of Himself and Others Similarly Situated** ) | |
| ) | |
| **Plaintiff,** ) | **Judge Christopher A. Boyko** |
| ) | |
| **vs.** ) | |
| ) | **OPINION AND ORDER** |
| ) | |
| **WEST MARINE PRODUCTS, INC.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**CHRISTOPHER A. BOYKO, J.:**

This matter comes before the court upon cross motions by the parties for summary

judgment on the initial issues of liability and damages concerning Plaintiff Donald "Chip"

Cassidy's proposed class action.  Plaintiff filed his complaint, on behalf of himself and others

similarly situated, alleging violations of consumer protection and deceptive trade practices acts

of the states of Ohio, Michigan, and Florida by Defendant West Marine Products, Inc.  After

reviewing the briefs filed by each party in support of its own motion, in opposition to the

opposing party's motion, and in reply, this Court remands the case for lack of subject matter

jurisdiction because diversity jurisdiction under 28 U.S.C. § 1332(a) does not exist.


### I. FACTUAL BACKGROUND

Defendant first started marketing marine oil under its own West Marine brands in 2002.

Kinpak, Inc., which sells marine oils under its own STAR BRITE brand, blended and packaged

the marine oil for Defendant's brands.  Kinpak began developing two formulas of marine oils, a premium blend and a super premium blend, in 2001 to meet TC-W3 qualifications.  TC-W3 qualifications are set by the National Marine Manufacturer's Association (NMMA).  After submitting the formulas to a laboratory for testing according to NMMA's TC-W3 qualifications, Kinpak applied for and received authorization from NMMA to use the TC-W3 certification mark on the STAR BRITE brands under which the marine oils were sold.  Since the initial license, Kinpak has employed quality control measures to ensure that its oils continue to meet the qualifications and has maintained a license for its STAR BRITE products from the initial license to present by applying for annual renewals.  When Defendant began selling its own brands of marine oil, Kinpak submitted the initial license application for use of the TC-W3 certification mark on those brands.  Kinpak used the same batches of oil it produced when bottling its own brands and the Defendant's brands.  While Kinpak maintained the licenses to use the TC-W3 certification mark on its own brands, Defendant did not know it needed to renew the licenses annually, so the licenses on its brands of marine oil lapsed in 2003.  As soon as Defendant became aware in August 2005 that its marine oil brands were not properly licensed to use the TC-W3 certification mark, Defendant submitted the necessary application and fees to NMMA, and the licenses became effective in September 2005.  Since then, Defendant has maintained the licenses to use the certification mark.

Plaintiff purchased Defendant's marine oil brands in Sandusky, Ohio for use in his watercraft engine.  In the summer of 2003, he began to notice engine troubles.  Plaintiff had worries and concerns the troubles could be caused by a motor oil that was not TC-W3 certified and asserts he would never purchase a marine oil that did not have TC-W3 certification.  After

learning that Defendant's marine oil products were not listed in NMMA's online record of certified products, Plaintiff brought a complaint against Defendant alleging Defendant made misrepresentations about its products.

Plaintiff filed his complaint on behalf of himself and others similarly situated, "[a]ll persons who purchased West Marine 2-Cycle TC-W3 Engine Oil in Ohio, Michigan, and Florida" from the beginning of the period during which Defendant's engine oil was not certified to present.  (Compl. ¶ 13 Aug. 8, 2005.)  Plaintiff brought his action in the Court of Common Pleas, alleging in his complaint Defendant violated the Ohio Consumer Sales Practices Act (OCSPA), Ohio Deceptive Trade Practices Act (ODTPA), Michigan Consumer Protection Act (MCPA), and Florida Deceptive and Unfair Trade Practices Act (FDUTPA).  On Sept. 21, 2005, Defendant filed Notice of Removal from state to federal court on account of diversity jurisdiction under 28 U.S.C. § 1332(a).  Subsequently, on October 6, 2005 Plaintiff moved to remand the case to state court for failure of Plaintiff's claims to meet the $75,000 jurisdictional amount in controversy requirement.  28 U.S.C. § 1332(a).  On January 23, 2006, this Court denied the motion for remand, finding the amount in controversy requirement was met because Plaintiff's own claims, resulting in an unspecified figure, could reasonably be greater than the requirement and because Defendant submitted an affidavit supporting, by a preponderance of evidence, that injunctive relief would amount to costs greater than the requirement. Subsequently, the parties filed cross motions of summary judgment concerning the initial issues of liability and damages for the proposed class action.  In reviewing the briefs accompanying these motions, this Court readdressed whether diversity jurisdiction indeed exists to provide this Court with subject matter jurisdiction over this case.

## II. LAW AND ANALYSIS

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  A court may raise the issue of subject matter jurisdiction of its own initiative at any stage in the litigation.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).

Plaintiff's case was removed to federal court on the basis of diversity jurisdiction. Federal District Courts have original jurisdiction over civil actions between individuals of different states in which the amount in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a)(1).  In assessing whether Plaintiff's unspecified damages will exceed the federal amount in controversy requirement, courts look for a preponderance of evidence. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 158 (6th Cir. 1993).  In doing so, courts may weigh evidence, including affidavits.  *Richmond v. Populous Group, LLC*, No. 4:05 CV 01900, 2005 WL 2338824, at *2 (N.D. Ohio Sept. 23, 2005) (citing *United States v. A.D. Roe Co.*, 186 F.3d 717, 722 n. 4 (6th Cir. 1999)).  After reviewing the evidence presented in and accompanying the briefs of the parties supporting their cross motions on liability and damages, this Court finds diversity jurisdiction does not exist in this case because the amount in controversy requirement is not met.

In assessing whether diversity jurisdiction exists in this case, without providing a holding on the cross motions for summary judgment or deciding whether Defendant did or did not violate the OCSPA, ODTPA, MCPA, or FDUTPA, this court considers the maximum possible damages Plaintiff could recover if Defendant did indeed violate the statutes.  For the reasons set forth

-4-

below, this Court finds that Plaintiff could not receive damages of more than $75,000 and

diversity jurisdiction does not exist.

**A. Damages under the Ohio Consumer Sales Practices Act (OCSPA) and Ohio Deceptive**

**Trade Practices Act (ODTPA)**

**i. Under the OCSPA, Plaintiff cannot establish the required notice to allow him to**

**individually receive an amount three times his actual damages or a statutory amount of**

**$200, or to recover damages in a class action.**

Plaintiff would recover the most damages for Defendant's alleged OCSPA violation if he

established Defendant had prior notice his alleged act would violate the OCSPA.  Ohio Rev.

Code § 1345.09(B) provides,

> Where the violation was an act or practice declared to be deceptive or
> unconscionable by rule adopted under division (B)(2) of section 1345.05 of the
> Revised Code before the consumer transaction on which the action is based, or an
> act or practice determined by a court of this state to violate section 1345.02,
> 1345.03, or 1345.031 of the Revised Code and committed after the decision
> containing the determination has been made available for public inspection under
> division (A)(3) of section 1345.05 of the Revised Code, the consumer may
> rescind the transaction or recover, but not in a class action, three times the amount
> of the consumer's actual damages or two hundred dollars, whichever is greater, or
> recover damages or other appropriate relief in a class action under Civil Rule 23,
> as amended.

Ohio Rev. Code § 1345.09(B).  In other words, and as clarified in *Marrone v. Philip Morris*

*U.S.A., Inc.*, "there must be a substantial similarity between a defendant's alleged violation of the

Act and an act or practice previously declared deceptive by either a rule promulgated by the

Attorney General or a court decision that was publicly available when the alleged violation

occurred." 110 Ohio St. 3d 5, 10 (2006).  Plaintiff has not provided any rule or court decision

substantially similar to Defendant's actions to put Defendant on prior notice such actions would

violate the OCSPA.

Defendant's actions were not previously declared deceptive by a rule adopted by the Attorney General.  Rules promulgated by the Attorney General are only sufficient for purposes of Ohio Rev. Code § 1345.09(B) if they are specific enough to be substantially similar to the specific act or practice at issue.  *Marrone*, 110 Ohio St. 3d at 10 ("A general rule is not sufficient to put a reasonable person on notice of the prohibition against a specific act or practice."). The only Attorney General's rule that Plaintiff discusses is an alleged violation of Ohio Admin. Code § 109:4-3-10(A), which declares a deceptive act if a supplier makes "any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true."  In *Delahunt v. Cytodyne Techs.*, the court found that Ohio Admin. Code § 109:4-3-10 put the Defendants on notice their alleged conduct would violate the OCSPA.  241 F. Supp. 2d 827, 838 (S.D. Ohio 2003).  However, the court found a general rule adequately provided prior notice to a supplier that a particular act or practice violated the OCSPA.  *Id.* at 837-38.  As discussed above, the later case *Marrone* expressly rejected the idea that a general rule was enough to put a reasonable person on notice.  Additionally, the court in *Marrone* stated, "Ohio Adm.Code 109:4-3-10 is a generic prohibition that does not refer to any specific act or practice."  110 Ohio St. 3d at 11.  Therefore, this Court finds Ohio Admin. Code § 109:4-3-10 is not sufficiently specific or similar to provide Defendant prior notice his actions would violate the OCSPA.

Plaintiff has not found or presented decisions by courts of this state, determining Defendant's alleged act to be deceptive, that were publicly available prior to Defendant's actions.  "Cases that involve industries and conduct very different from the defendant's do not

provide meaningful notice of specific acts or practices that violate the CSPA." *Marrone*, 110
Ohio St. 3d at 9.  The court in *Marrone* found that cases involving misrepresentations in other
industries were too dissimilar to provide prior notice that misrepresentations about light
cigarettes violated the OCSPA.  *Id; see also Faralli v. Hair Today, Gone Tomorrow*, No. 1:06
CV 504, 2007 WL 120664, at *14 (N.D. Ohio Jan. 10, 2007) (a prior decision prohibiting
unsubstantiated claims concerning permanency of hair removal by one type of device was not
sufficiently similar to the case at issue, which concerned misrepresentations about the efficacy of
a different hair removal device).  None of the cases provided by Plaintiff involve the same
industry or action of misrepresentation through the use of a certification mark involved in the
case at issue.  Cases concerning misrepresentations of licensing as required by law in the home
construction and improvement industries are not sufficiently similar in facts to provide notice.
*See, e.g.*, *Ohio, ex. rel. Montgomery v. Marcum*, No. 01 CVH 04 03650, (C.P. Franklin Cty.
2002); *Smith v. Best Constr. & Supply, Inc.*, No. 97 CV 117767, (C.P. Lorain Cty. 1998).  Cases
involving misrepresentations by a defendant that he was sponsored by or affiliated with a certain
organization are too dissimilar from the present case in which the alleged misrepresentations are
about a product.  *See, e.g.*, *Ohio ex. rel. Montgomery v. Freeman*, No. 95 CVH02-1035, (C.P.
Franklin Cty. 1995); *In the matter of Wayne Yeager*, No. C1 97 0108, (Office of the Att'y Gen.
1998); *Fisher v. Showtime Prods., Inc.*, No. 201347, (C.P. Cuyahoga Cty. 1992).  The car retail
industry of concern in *Cranford v. Joseph Airport Toyota, Inc.*, No. 15408, 1996 Ohio App.
LEXIS 2252 (Ohio Ct. App. 1996), makes that decision dissimilar to the facts in the present
case.  The language in *Wiseman v. Kirkman*, No. 1575, 2002 WL 31243522 (Ohio Ct. App.
2002), does not provide prior notice for the alleged deceptive action at issue, because that case

-7-

involved a defendant who contracted to provide one brand of water softener and then installed a different brand of softener.  No similar switch in brands is alleged here.  Since Plaintiff fails to provide a case substantially similar to the facts presently at issue, Defendant lacked the prior notice required to receive three times his actual damages or $200 statutory damages, or to bring his claim as a class action.

**ii. Plaintiff is not entitled to injunctive relief under either the OCSPA or ODTPA.**

Both the OCSPA and ODTPA allow a Plaintiff to request injunctive relief.  Ohio Rev. Code § 1345.09(D); Ohio Rev. Code § 4165.03(A)(1).  The court in *Ackerman v. Tri-City Geriatric & Healthcare, Inc.* established that when a statute grants specific injunctive remedy, the court does not have to undergo the balancing of equities ordinarily required to grant injunctive relief.  55 Ohio St. 2d 51, 56 (1978).  However, the court in *Procter & Gamble Co. v. Stoneham* limited this rule "to those statutes that contain specific criteria that the court must use in determining entitlement to an injunction."  140 Ohio App. 3d 260, 268 (Ohio App. 2000). While the OCSPA states consumers may seek injunctive relief, it does not provide prerequisites for that relief; therefore, "injunctive relief under § 1345.09(D) is governed by the same equitable principles that apply to injunctions generally."  *Mick v. Level Propane Gases, Inc.*, 168 F. Supp. 2d 804, 811 (S.D. Ohio 2001).  Those equitable principles provide that a party seeking a permanent injunction, as Plaintiff here seeks, must show "the injunction is necessary to prevent irreparable harm and that the party does not have an adequate remedy at law."  *Procter & Gamble Co.*, 140 Ohio App. 3d at 267.  Since Plaintiff in his briefs and accompanying exhibits has not shown facts suggesting future irreparable harm, or even the likelihood that Defendant will fail to properly renew its licenses again, this Court could not grant Plaintiff's request for

injunctive relief consisting of an order enjoining Defendant from future violations of the

OCSPA, requiring Defendant to institute measures to prevent future violations and to inform

customers of Defendant's failure to undergo all procedures necessary for certification of the oil

by the NMMA.

　　　　Plaintiff has failed to demonstrate a risk of irreparable harm in the absence of injunctive

relief, because he has failed to rebut Defendant's evidence that future violations of the OCSPA

are unlikely to occur.   The requirement that a plaintiff show irreparable harm "cannot be met

where there is no showing of any real or immediate threat that the plaintiff will be wronged

again." *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  Because Kinpak, the company which

blended and packaged Defendant's oil brands, prepared and submitted the initial application to

NMMA for use of the TC-W3 certification mark on Defendant's brands, Defendant was unaware

the license had to be renewed each year.  (Hawley Aff. ¶ 4, Jan. 30, 2007.)  As soon as

Defendant learned in August 2005 that beginning in January 2003 its marine oils were not

properly licensed to use the TC-W3 certification mark, it submitted the required application and

fees to NMMA, and the licenses became effective in September 2005.  (Hawley Aff. ¶ 7, 8.)

Since then, Defendant has maintained the licenses on its marine oils, submitting annual renewals

in both 2006 and 2007.  (Hawley Aff. ¶ 8.)  *See also* Exhibit B to Hawley Aff.  Plaintiff has

failed to raise an issue of fact whether Defendant's lapse in licensing its oils was other than a

mistake or whether Defendant has not properly maintained the licenses on its oils since

September 2005.

　　　　In addition, during the time when Defendant's oils were not properly certified, the oils

still met the qualifications required for certification.  During that time, Kinpak maintained

-9-

licenses on its own brands of marine oils, and Kinpak bottled Defendant's brands from the same batches of oil as Kinpak used for its own brands.  (Dornau Aff. ¶ 15, Jan. 30, 2007.)  Although Plaintiff had "concerns about the performance of the engine" of his boat (which has since been sold) because it "required constant maintenance," monthly replacement of spark plugs, and starting fluid (Cassidy Answers to Interrogs. 3, Jan. 16, 2007), the only repair order invoice that he provided was for a "Spring Tune Up" and for cleaning and adjusting of the carburator.  This evidence alone is insufficient to raise an issue of fact as to the quality of Defendant's oil during the time when Defendant did not pay the licensing fees required to maintain TC-W3 certification, especially since Plaintiff provided nothing in response to Defendant's Request for Production of Documents concerning the quality of Defendant's oil or whether the oil could pass TC-W3 qualification tests.  No question of fact exists whether Defendant has maintained its marine oil licenses since realizing its mistake, Plaintiff has provided nothing to suggest that Defendant will not maintain its oil licenses in the future, and no question of fact exists as to the consistent quality of Defendant's oil even during the time of inadequate licensing.  Therefore, Plaintiff has not demonstrated a threat of irreparable harm, and permanent injunctive relief is unavailable to the Plaintiff and cannot be considered in determining if the $75,000 amount in controversy is met.

**iii. Even if Plaintiff prevailed in his claims, he is not entitled to reasonable attorney's fees.**

Under both the OCSPA and the ODTPA, a court may award reasonable attorney's fees to a plaintiff on the condition that the court finds the defendant has willfully or knowingly committed an act violating the statutes.  Ohio Rev. Code § 1345.09(F); Ohio Rev. Code § 4165.03(B).  As discussed above, Defendant has provided evidence accompanying its motion for

-10-

summary judgment indicating its failure to renew its certification license with NMMA was an unintentional misunderstanding, and Plaintiff raised nothing to suggest a question of fact concerning this issue.  Therefore, even if Plaintiff prevailed in his OCSPA and ODTPA claims against Defendant, this Court would not be able to award reasonable attorney's fees.

### iv. Plaintiff could recover actual damages under the OCSPA and ODTPA.

The OCSPA allows a consumer to recover "damages," Ohio Rev. Code § 1345.09(A), and the ODTPA allows a consumer to recover "actual damages."  Ohio Rev. Code § 4165.03(A)(2).  Both the term "actual damages" and the unrestricted term "damages" include noneconomic as well as economic damages.  *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St. 3d 177 (2006).  If Plaintiff were successful in this action, he would not be able to recover actual damages in excess of $75,000.

Plaintiff argues he should recover noneconomic damages because of his "worries and concerns about the effect [Defendant's] noncertified oil may have had on his marine engine." (Pl.'s Resp. in Opp'n to West Marine's Mot. for Summ. J. at 7.)  A plaintiff can recover noneconomic damages if the evidence shows intentional or malicious actions on the part of the defendant.  *Whitaker*, 111 Ohio St. 3d at 185.  As discussed previously, Defendant provided factual support for its contention that its failure to submit an application and pay licensing fees in order to maintain the TC-W3 certification on its oils was a mistake, and Plaintiff did not raise an issue of fact as to this mistake.  Plaintiff provided no facts suggesting Defendant's actions were intentional, let alone malicious.  Therefore, this Court should deny Plaintiff noneconomic damages.

As for economic damages, they would be limited to costs associated with the purchase of

the marine oil itself, because Plaintiff outright states he "is not seeking to recover for any damages to his Yamaha Wave Venture."  (Reply in Supp. of Pl.'s Mot. for a Finding of Liability on the Part of Def. West Marine for Violations of the Ohio Consumer Sales Practices Act and for an Award of Damages to be Determined by a Duly Impaneled Jury at 6.)  Courts commonly use two different methods to determine the damages associated with a plaintiff's purchase of a misrepresented product.  One such measure is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had as warranted."  *Evans v. Cheek*, 65 Ohio App. 3d 535, 537 (Ohio App. 1989).  Alternatively, a court could award the plaintiff the entire cost of the misrepresented product the plaintiff purchased.  *See Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003).  As for determining the difference in value between the product bought by Plaintiff and the product he expected, it cannot be based upon a difference in quality, because even though Defendant's oil was not properly certified, there is no question it was of the quality Plaintiff expected.  However, Plaintiff suggests the difference in value is the entire price of the oil because oil without certification has no value to him.  (Cassidy Answers to Interrogs. 6.)  Even if this Court gives Plaintiff the benefit of the doubt that damages should be the cost of the products Plaintiff purchased, the facts presented by the parties do not indicate how much product Plaintiff individually purchased.  Plaintiff provided no documents in response to Defendant's Request for Production of Documents concerning purchase receipts for oil.[1]  Therefore, the likelihood Plaintiff's individual purchases of oil between January 2003 and September 2005 will add up to $75,000 is virtually non-existent.

---

[1]In addition, Plaintiff has neither produced any containers of the oil that he purchased nor documents relating to such containers as requested by Defendant.

-12-

Although Plaintiff could recover actual damages under the OCSPA and the ODTPA, these claimed damages would be insufficient to meet the $75,000 requirement necessary for diversity jurisdiction.

**B. Damages under the Michigan Consumer Protection Act (MCPA) and Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**

In the cross motions on the issues of liability and damages, neither party has discussed why requests for injunctive relief or actual damages under the MCPA or FDUTPA would be determined any differently from the determination under the OCSPA and ODTPA.  As for attorney's damages under the MCPA and FDUTPA, even if Plaintiff prevailed under these statutes and was entitled to reasonable attorney's fees, no showing exists why these fees would be greater than $75,000.  Even in Defendant's Response to Plaintiff's Motion to Remand, Defendant did not meet the preponderance of evidence burden.  *Gafford v. Gen. Elec. Co.*, 997 F. 2d 150, 158 (6th Cir. 1993).  Defendant alleged that "legal work representing Plaintiff will require significant time;" however, he provided no evidence to support this argument.  (Def.'s Resp. to Pl.'s Mot. to Remand 5.)  In previously overruling Plaintiff's Motion to Remand, this Court did not address whether Defendant met the preponderance of evidence burden to prove Plaintiff's damages would exceed $75,000 and did not use Defendant's argument about attorney's fees to support its holding.  Now, this court finds Plaintiff's claim for attorney's fees will not alone support the amount in controversy requirement for diversity jurisdiction.


**III. CONCLUSION**

After reviewing the parties' briefs accompanying their cross motions on the issues of

liability and damages, this Court found it necessary to address whether it possesses subject matter jurisdiction over the case through diversity jurisdiction.  Since the evidence on record shows Plaintiff cannot recover injunctive relief, actual damages, and reasonable attorney's fees in an amount exceeding $75,000, this Court remands this case for lack of jurisdiction.

**IT IS SO ORDERED.**

**DATE: June 20, 2007**

s/Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**United States District Judge**